UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| KWITCHURBELIAKIN, LLC, | ) |
| | ) |
| Appellant, | ) No. 3:10-CV-170 JVB |
| | ) |
| v. | ) |
| | ) |
| LAPORTE SAVINGS BANK, | ) |
| | ) |
| Appellee. | ) |

**OPINION AND ORDER**

Appellant Kwitchurbeliakin, LLC, seeks review of the bankruptcy court's granting of Appellee LaPorte Savings Bank's Motion for Appointment of a Trustee.

**A.**  **Standard of Review**

Title 28 U.S.C. § 158(a)(1) gives district courts jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy courts. In bankruptcy appeals, district courts ordinarily review the bankruptcy court's determinations of law *de novo* and its findings of fact for clear error, but on issues that the bankruptcy code has committed to the discretion of the bankruptcy court, the Court reviews such decisions only for an abuse of discretion. *Wiese v. Cmty. Bank of Cent. Wis.*, 552 F.3d 584, 588 (7th Cir. 2009). The appointment of a trustee under 11 U.S.C. § 1104(a) is a discretionary decision reviewed for an abuse of discretion. *See In re Sharon Steel Corp.*, 871 F.3d 1217, 1226 (3d Cir. 1989); *In re Marvel Entertainment Group*, 140 F.3d 463, 470 (3d Cir. 1998); *In re Cajun Electric Power Cooperative, Inc.*, 69 F.3d 746, 749 (5th Cir. 1995) The Court of Appeals for the Seventh Circuit has held that a court "'abuses its

discretion when its decision is premised on an incorrect legal principle or a clearly erroneous factual finding, or when the record contains no evidence on which the court rationally could have relied.'" *Weise*, 552 F.3d at 588 (quoting *Corporate Assets, Inc. v. Paloian*, 368 F.3d 761, 767 (7th Cir. 2004)). Additionally, a court abuses its discretion when "'no reasonable person could agree' with the decision to deny relief." *Eskridge v. Cook County*, 577 F.3d 806, 809 (7th Cir. 2009) (quoting *McCormick v. City of Chi.*, 230 F.3d 319, 327 (7th Cir. 2000)).

**B.      Procedural history**

On March 4, 2010, Appellant Kwitchurbeliakin, LLC, filed its Chapter 11 voluntary petition. On March 9, 2010, Appellee LaPorte Savings Bank ("the Bank") filed its motion to appoint a trustee. On March 12, 2010, the Bank filed a motion to expedite the hearing on its motion to appoint a trustee. The same day, Kwitchurbeliakin filed an objection to the Bank's motion to appoint a trustee and the motion to expedite the hearing. On March 15, 2010, the bankruptcy court granted the Bank's motion to expedite the hearing. The bankruptcy court held its hearing on the motion to appoint a trustee on March 22, 2010.

**C.      Facts**

Kwitchurbeliakin, was formed on April 27, 2004, by its members Todd Apfel and Luise Marie Lesser. On the same day, Mr. Apfel and Ms. Lesser formed Arnie's Bowling and Recreation Center, Inc. ("Arnie's").

On May 31, 2005, Kwitchurbeliakin entered into a mortgage agreement with the Bank for the purchase of Thunderbird Lanes, a bowling alley located in LaPorte, Indiana.

Kwitchurbeliakin purchased the bowling alley for $1,500,000 from Larry and Marge Burchiel. Kwitchurbeliakin and Arnie's entered into a lease agreement in which Arnie's agreed to rent the facility from Kwitchurbeliakin for ten years at $13,000 per month. Some time later, Mr. Apfel entered into a second mortgage with the Bank on behalf of Kwitchurbeliakin, totaling the two mortgages to over $800,000. Kwitchurbeliakin has not made its payment on either mortgage since April 2009.

Russell Klosinski, who testified at the hearing, is the executive vice president of the Bank and was the lending officer on the loan with Kwitchurbeliakin. He testified that he was very familiar with Thunderbird Lanes because the Bank had the loan on the business for at least fifteen years, including loans made to previous owners of the bowling alley. According to Mr. Klosinski, with previous owners, the loan payment was made on time without exception. At the time of the hearing, however, the Bank had not received a mortgage payment from Kwitchurbeliakin in a year. Additionally, to Mr. Klosinski's knowledge, Kwitchurbeliakin had not paid its real estate taxes for the two years before the hearing. Finally, according to Mr. Klosinski, the Bank was not aware of Arnie's existence, or of the lease agreement between Kwitchurbeliakin and Arnie's, until a few months before the hearing. Had the Bank known about Arnie's, it would have likely required a guarantee from it, and the existence of Arnie's could have possibly affected Kwitchurbeliakin's ability to obtain a loan.

In addition to being the loan officer on Kwitchurbeliakin's loan, Mr. Klosinski had bowled at Thunderbird Lanes for thirty years. He testified that the building and equipment had deteriorated, and the parking lot had not been resurfaced in a number of years. According to Mr. Klosinski, the building's roof had been leaking and there were plastic bags stapled to the roof to

control the leaking problem. He further testified that at least nine bowling leagues had moved their organization to the other bowling center in LaPorte. For all these reasons, the Bank had lost its confidence in the ability of Kwitchurbeliakin to run and manage its business.

Prior to Kwitchurbeliakin's ownership of the bowling alley, Larry Burchiel managed Thunderbird Lanes for about twenty-five years, and he and his wife purchased the bowling alley in 2000. Mr. and Mrs. Burchiel sold the business in 2005 and were able to retire at age fifty-five on the profit they made. In early 2010, a foreclosure action was initiated against Kwitchurbeliakin in state court. The Bank obtained an order from the state court appointing Mr. Burchiel as receiver, or a person who makes efforts to protect and maintain assets in the best interests of the creditors, of Kwitchurbeliakin.

According to Mr. Burchiel, when he sold Thunderbird Lanes to Kwitchurbeliakin, they had about 1,260 league bowlers a week. In February 2010, under Kwitchurbeliakin's ownership, Mr. Burchiel estimated that Thunderbird Lane had around 570 bowlers. Mr. Burchiel testified that league bowlers are the key to running a profitable bowling operation, and that if the bowling alley's league play is down, the business is going to suffer. In his opinion, the only reason bowling leagues would leave is mismanagement. Mr. Burchiel had heard that Mr. Apfel had told his customers that if they did not like the way things were run at Thunderbird Lanes, they could take their business elsewhere, and Mr. Apfel had even given customers a few dollars to go to a competitor bowling alley.

When Mr. Burchiel was appointed the receiver, he worked on improving the quality of the bowling facility. He installed light bulbs in the parking lot so that the women's league would feel more comfortable leaving at night and replaced the hand dryers with hand towels at the

league bowlers' request. Mr. Burchiel cleaned up the parking lot and swept "a snow shovelful of cigarette butts" out of the entryway. (DE 3-1 at 39). The health department had issued violations because the filters above the grill had not been cleaned and the freezer was not operating properly, and Mr. Burchiel remedied those conditions. He also implemented a system of balancing the bartender cash register at the end of each shift.

Mr. Apfel, the representative of Kwitchurbeliakin, testified at the hearing. Mr. Apfel maintained that Kwitchurbeliakin acted merely as the landlord to Arnie's, who actually operated the bowling business. Furthermore, he believed that the Bank knew of the existence of Arnie's, because it had a checking account with the Bank and he thought Kwitchurbeliakin's accountant had told Mr. Klosinski about Arnie's. He testified that Kwitchurbeliakin had been unable to make its loan payments to the Bank since May 2009 because Arnie's was not making enough money to pay Kwitchurbeliakin its lease payment. Arnie's has also filed for bankruptcy.

Mr. Apfel maintained that his business only lost about 300 league bowlers since Kwitchurbeliakin began operating the business. He believed that the bowling alley lost the league bowlers in part because of the recession and in part because some of the leagues were not happy at Thunderbird Lanes and were looking for excuses to bowl elsewhere. Furthermore, he denied ever giving any customers money to bowl at a competitor alley.

On the other hand, according to Mr. Apfel, since January 2010, Arnie's has switched its marketing focus to "open play" bowlers, or bowlers that are not part of a league, because they pay more. Through his membership in the Bowling Proprietors' Association of America, Mr. Apfel had found that the poor economy had hit other bowling alleys around the country harder than Thunderbird Lanes.

Next, Mr. Apfel testified as to the bowling alley's physical condition. He believed that the building was in the same shape as the day that they acquired it. He acknowledged that there were problems with the roof; however, when they first bought Thunderbird Lanes, they went up to the attic and saw buckets catching leaks everywhere. According to Mr. Apfel, they fixed a major part of the problem in the summer of 2009, but to entirely fix the roof would cost around $125,000. Neither Kwitchurbeliakin nor Arnie's could afford to fix the roof at that price. Regarding the lights in and around the building, it was Mr. Apfel's intention to replace them during the summer when the leagues are generally not bowling. Finally, Mr. Apfel said that since Kwitchurbeliakin did not have the money to completely repave the parking lot, they filled in the potholes as a fix to the parking lot problems.

### D.     Bankruptcy Court's Decision

Although lengthy, the Court cites all relevant portions of the bankruptcy court's decision, made orally at the hearing on the Bank's motion to appoint a trustee:

> We're here this afternoon under 1104(a), which is entitled Appointment of a Trustee or Examiner. . . . [I]t's been at least a year since there were payments made on the mortgage that this Debtor owes to this Bank. There's been a failure to pay real estate taxes for at least that length of time. Mr. Klosinski has been in and out of the physical facility many times; testified that he bowled there for thirty years. Said that the facility is deteriorating. The roof leaks, the parking lot needs resurfacing. But more critical, the Debtor has lost nine bowling leagues. The leagues have moved to a competitor in LaPorte. And that the bowling leagues in the bowling business are the lifeblood of a successful bowling operation.
>
>  . . . [B]y the debtors filings, both [Kwitchurbeliakin and Arnie's] are doing business, both of these entities, which are separate corporate entities . . . were doing business as Thunderbird Lanes. And then, the documents show that the stockholders are the same, the officers are the same.
> It appears that Kwitchurbeliakin owns the building and the parking lot and the evidence is that they're deteriorating; whereas, Arnie's operates the business. . . .

6

Certainly the fact that a commercial lease was entered into between those two entities without the consent of the Bank is unusual and . . . I think it's approaching the level of fraud.

 . . . [Kwitchurbeliakin's counsel] quite rightly wanted to know from Mr. Klosinski . . . how this place isn't being managed properly. . . . Mr. Klosinski responds my league left. I used to bowl there. The youth bowlers have left. Nine leagues have left. Mr. Apfel told me a year ago if you don't like it go elsewhere. Which seems kind of not exactly the best way to attract customers to your . . . enterprise. . . . And I can take judicial notice that when bowlers leave and leagues leave, the revenues probably are going to suffer. Why would a competent businessman tell people to hit the trail, go down the street? In fact I'll even pay you to go down the street, which also is one of the allegations here.

 . . . [T]he Bank hasn't been provided with the statements that the contract calls for. We don't have any number for 2008 or 2009. Well, if you're a lender and your loan documents require that those be provided, that puts you on alert something's going on that's not good. . . . There's something not right if we're not getting monthly operating reports, profit and loss statements, a budget . . . [Mr. Klosinski] also testified that if we'd known of this dual existence, we would have gotten a guarantee to protect ourselves.

 . . . [Mr. Burchiel] ran this bowling alley twenty-five years. . . . Did well enough at it for five years, he was able to sell it and retire at age fifty-five. And, then, the state court appointed him as the Receiver. . . . [H]e replaced lights. He noticed problems with the roof. . . . [T]he most compelling part of his testimony was his personal knowledge that . . . when he sold out in '05 there were 1,267 league bowlers per week and now it's down to 520.

. . . North side of the building the lights were out. Women league bowlers complain there's no lights over there. It's uncomfortable for women or anybody else to go to your car in a parking lot at night when it's dark out. . . . Mr. Burchiel . . . established checks and balances [on the bartender cash register]. [He] [t]estified that the health department had written up the bowling alley prior to the time he became the Receiver.

. . . [I]t soon becomes clear to me as the fact finder that we have risen to the level of clear and convincing evidence that there's been incompetent management. [The Bank's] interests are being harmed by the continued management by Mr. Apfel.

[Mr. Apfel] has insufficient money to fix the roof. Doesn't have money to pay the Bank. Doesn't have money to pay the real estate taxes. And, apparently, hasn't

budgeted sufficient money in a capital expense fund . . . to prepare for the inevitability of repairs.

. . . Bank's not being paid, real estate taxes aren't being paid, salaries aren't being paid, no partial payments to the Bank. Going to be twelve months behind to the Bank in April [2010]. And then, last, there's this whole fiduciary issue of two entities here that are both in [bankruptcy] with the same president and vice president. Who's going to sue whom if necessary? . . . This place has not been run properly, which has led up to the loss of customers and the inability to pay the creditors here, and it seems to me that the burden of proof of clear and convincing evidence has been met even in the extraordinary remedy like the appointment of a Trustee under Section 1104.

(DE 3-1 at 94-102).

When the bankruptcy court concluded, Kwitchurbeliakin's counsel reiterated that Arnie's was a separate entity that operated the business, to which the bankruptcy court replied, "[A]ll I'm caring about right now . . . is what's before me, and that's Kwitchurbeliakin." (DE 3-1 at 103).

### E. Analysis

Motions to appoint a trustee are governed by 11 U.S.C. § 1104(a):

At any time after the commencement of the case but before confirmation of a plan, on request of a party interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee–

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case;

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

The appointment of a trustee is considered an extraordinary remedy and one that requires proof by clear and convincing evidence. *See Adams v. Marwil*, 564 F.3d 541, 546 (2d. Cir. 2009); *see*

*also In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994) (citing *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d. Cir. 1989)). "To be 'clear and convincing,' the evidence presented must 'leave no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question.'" *Davis v. Combes*, 294 F.3d 931, 926 (7th Cir. 2002) (citations omitted). There is a presumption against appointing a trustee, but the decision to appoint a trustee is within the bankruptcy court's discretion. *Sharon Steel Corp.*, 871 F.2d at 1226.

On appeal, Kwitchurbeliakin insists that the bankruptcy court abused its discretion in appointing a trustee. In support of its contention, Kwitchurbeliakin argues that the bankruptcy court failed to distinguish between the acts of Kwitchurbeliakin and those of Arnie's. According to Kwitchurbeliakin, the only findings of fact the bankruptcy court made directly pertaining to Kwitchurbeliakin were its non-payment of the loan with the Bank, its failure to pay real estate taxes for a year, the building's leaky roof, the need to resurface the parking lot, and certain documents not being provided to the Bank. On the other hand, Kwitchurbeliakin argues, the bankruptcy court's findings of fact relating to the loss of bowling leagues, citations from the health department, missing lights, and checks and balances on cash registers pertain only to Arnie's. Looking solely at those acts attributable to Kwitchurbeliakin, it maintains, "they simply do not meet the standard of § 1104(a)(1) for the appointment of a trustee." (DE 10 at 29).

For the reasons stated in the bankruptcy court's oral ruling at the hearing on the Bank's motion to appoint the trustee, the Court finds that the bankruptcy court did not abuse its discretion. Even supposing, as Kwitchurbeliakin argues, that the bankruptcy court considered actions attributable to Arnie's in making its decision, the evidence attributable solely to Kwitchurbeliakin was sufficient to reach the clear and convincing standard. Furthermore, the

9

bankruptcy court explicitly acknowledged that its decision was confined solely to Kwitchurbeliakin's actions. In any case, the bankruptcy court could have properly considered the dual existence of Arnie's and Kwitchurbeliakin as evidence of Kwitchurbeliakin's, fraud, dishonesty, mismanagement, or inability to continue to manage its own affairs. After a full examination of the record, it cannot be said that "'no reasonable person could agree'" with the bankruptcy court decision, *Eskridge*, 577 F.3d at 809, or that "the record contains no evidence on which the court rationally could have relied." *Weise*, 552 F.3d at 588. The Court concludes that the bankruptcy court did not abuse its discretion, and its judgment is affirmed.

**F.     Conclusion**

For the foregoing reasons, the judgment of the bankruptcy court is AFFIRMED.

SO ORDERED on January 10, 2011.

s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE